UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

CHRISTIAN YUN and ARUNA
VISWESWARA, on behalf of themselves and
all others similarly situated,

       *Plaintiffs*,

v.

JETBLUE AIRWAYS CORPORATION,

       *Defendant.*

---------------------------------------------------------- X

Case No.

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiffs Christian Yun and Aruna Visweswara ("Plaintiffs") bring this class action complaint (the "Action") on behalf of themselves and others similarly situated ("Class Members") for violations of federal and state law against Defendant, JetBlue Airways Corporation ("JetBlue" or the "Defendant") upon personal knowledge as to themselves and their own actions, information and belief, and the investigation of counsel, seeking actual damages, statutory damages, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief, and any other relief this Court deems just and proper, as follows.

## INTRODUCTION

1.     This Action concerns Defendant JetBlue's surveillance of its customers, in violation of their privacy, to amass personal data that JetBlue in turn weaponizes by charging increased prices for flights.

2.     JetBlue is a major airline operator in the United States that touts its ability to provide low-cost travel options.

3.     JetBlue enables travelers to search for, purchase, and book flights through its website, **www.jetblue.com**, and JetBlue's mobile app.

4.     Plaintiffs and Class Members are JetBlue customers who have used Defendant's website, www.jetblue.com, to search for and book flights, and compare flight prices.

5.     Unbeknownst to Plaintiffs and Class Members, JetBlue collects and tracks individuals' online activity to amass troves of individuals' highly sensitive identifying personal data ("PII") including name, connected accounts, email address, and internet protocol ("IP") address.

6.     Specifically, JetBlue uses tracking technology embedded in its source code that allows third parties to eavesdrop on, collect, retain, and use individuals' PII, without their

1

knowledge or consent.  The existence of the trackers used by Defendant and exploited by third parties on JetBlue's website is a breach of consumers' privacy.

7.      JetBlue begins collecting PII the moment an individual enters the JetBlue website and continues its tracking throughout individuals' online activities.

8.      JetBlue collects PII to determine what price to charge an individual for a particular flight.  Specifically, JetBlue assesses the PII it collects as part of its algorithmic pricing formula, giving JetBlue specific information to charge consumers the highest price possible based on what the consumer is anticipated to be willing to pay.

9.      JetBlue publicly acknowledged its data-based surveillance pricing practices in an April 18, 2026 X post:



10.      Worse, JetBlue's surveillance pricing practices depend on third-party entities that enable surreptitious data collection.  These entities are behavioral analytics firms Dynamic Yield by Mastercard ("Dynamic Yield") and FullStory, Inc. ("FullStory").

11.     Dynamic Yield (owned by Mastercard) helps consumer-facing companies "algorithmically match content, products, and offers to each customer's preferences and anticipate future behavior using AI."[1]

12.     FullStory touts itself as "[t]he most trusted name in behavioral data analytics" and specializes in "empower[ing] smarter decisions and sharper direction" for its clients.[2]  FullStory claims that it can "[c]apture real user behavior and put it to work, so your AI moves faster, and your experience improves."[3]

13.     Plaintiffs and Class Members were not aware of JetBlue's surreptitious surveillance pricing or JetBlue's use of their personal information to set—and increase—prices for flights they searched for and purchased through JetBlue's website.

14.     At all relevant times, JetBlue failed to: (1) disclose that surveillance trackers are used to set pricing; (2) disclose that the trackers are used for behavior tracking of individuals; and (3) disclose that JetBlue shares consumer data with third parties for the purpose of setting (and raising) prices.[4]  In addition, neither Defendant's "Flights Terms and Conditions" nor "Website Terms" disclose JetBlue's dynamic pricing practices.  Indeed, while the Privacy Policy promises that "any other business or commercial purposes" not enumerated would be fulfilled "at your direction or with your notice and/or consent," JetBlue never sought consumers' consent to use their data for surveillance pricing.[5]

---

[1] Dynamic Yield, https://www.dynamicyield.com/ (last visited June 2, 2026).

[2] *Behavioral Data Platform*, FullStory, https://www.fullstory.com/ps/behavioral-data-platform/ (last visited June 2, 2026).

[3] FullStory, https://www.fullstory.com/ (last visited June 2, 2026).

[4] *See JetBlue Airways Privacy Policy*, JetBlue (June 2025), https://www.jetblue.com/legal/privacy (nowhere listing dynamic pricing when noting the "business purposes for collecting and using information" but rather promising that "any other business or commercial purposes" not listed would be fulfilled "at your direction or with your notice and/or consent").

[5] *See Flights Terms and Conditions*, JetBlue, https://www.jetblue.com/legal/flights-terms (last visited June 2, 2026); *Website Terms and Conditions*, JetBlue, https://www.jetblue.com/legal/website-terms (last visited June 2, 2026)

15.     Plaintiffs and Class Members had a reasonable expectation of privacy in the personal information that JetBlue collected—especially where JetBlue collected personal information **before** Plaintiffs and Class Members ever entered any information into JetBlue's website.

16.     Plaintiffs and Class Members had a reasonable expectation that JetBlue would uphold its "best fare guarantee" for direct bookings, rather than increase prices based on individuals' sensitive, surreptitiously-collected personal information.

17.     As such, Defendant has blatantly invaded or allowed for the invasion of Plaintiffs' and Class Members' privacy rights.  Plaintiffs seek to recover for these harms under federal, state, and common law causes of action, pursuing actual damages, statutory damages, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief, and any other relief this Court deems just and proper.

## **JURISDICTION AND VENUE**

18.     *Subject Matter Jurisdiction.*   This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as well as pursuant to the Class Action Fairness Act of 2005, PL 109–2, 119 Stat 4 ("CAFA"), 28 U.S.C. § 1332(d).  As required by CAFA, the amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class Members, and minimal diversity exists because one or more putative Class Members are citizens of a different state than Defendant.  Namely, numerous members of the putative Class are domiciled in states around the country other than New York.

---

(ironically warning consumers that a "Limitation[] on Your Use of the JetBlue Websites" includes "Manipulating the price of a Product or Service").

4

19.     Additionally, this Court has supplemental jurisdiction over Plaintiffs' state law claims which are anchored by Plaintiffs' Electronic Communications Privacy Act (18 U.S.C. §§ 2510, *et seq.*, "ECPA") claim.

20.     *Personal Jurisdiction.*   This Court has personal jurisdiction over the litigants because Plaintiffs are located in New York, Defendant is headquartered in New York, Defendant is registered to do business in New York, Defendant's acts or practices were directed toward this State (and thus, Defendant intentionally availed itself of this jurisdiction by choosing to do business in New York) and, since the Defendant website is used throughout the United States, Defendant knew or should have known that tracking technologies were being used to intercept the actions of Class Members in New York.

21.     *Venue.*  Venue is proper because (1) Defendant is headquartered in and conducts business in this District, (2) Defendant's acts or omissions were directed toward this District, (3) a substantial part of the events, acts and omissions giving rise to Class members' claims occurred here, and (4) because Class Members were harmed here.

**PARTIES**

**PLAINTIFFS**

*Plaintiff Christian Yun*

22.     Plaintiff Yun is domiciled in the state of New York.

23.     During the relevant period, in December 2025, Plaintiff Yun visited Defendant's website to book airfare, including a flight from New York to California.  Plaintiff Yun provided his destination and arrival locations, information on his desired form of airfare accommodations *(e.g.*, his seating*),* the PII required to book a flight (*e.g.*, his name, address, government identification numbers, gender, etc.) and his payment information.  Additionally, the tracking

5

code collected other information, including whether Plaintiff Yun closed the website, a Google identifier, and other data that is detailed below.

24. While on Defendant's website, Plaintiff Yun was entirely unaware that he was being tracked for the purpose of setting pricing.

25. Not only was Plaintiff Yun not aware of the surreptitious collection and sharing of his data to third parties, but he was not adequately compensated for the value of his sensitive personal information.

26. Plaintiff Yun has suffered the following injuries from (1) the interception of his private data in the form of PII and travel information disclosed to JetBlue.com in service of making a purchase ("Private Data") for an unauthorized and exploitative purpose, (2) the disclosure of his Private Data to unauthorized third parties for an unauthorized and exploitative purpose, and (3) the failure to justly compensate Plaintiff Yun for his Private Data:

    a. The loss of value of PII and/or travel data that might be associated with Plaintiff Yun's visits to Defendant's website;

    b. Intrusion upon Plaintiff Yun's and Class Members' privacy on Defendant's website where it was reasonable for Plaintiff Yun and Class Members to have an expectation of privacy;

    c. Lack of compensation for the dissemination of Plaintiff Yun's and Class Members' data; and

    d. Profiting from the collection, retention, use and/or sale of Plaintiff Yun's and Class Members' data in a way that would be inequitable sans disgorgement of profit.

27. Had Plaintiff Yun known about the surreptitious collection and tracking of his PII, he would have used a different website to book his travel.

*Plaintiff Aruna Visweswara*

28.    Plaintiff Visweswara is domiciled in the state of New York.

29.    During the relevant period, in December 2025, Plaintiff Visweswara visited Defendant's website to book airfare, including a flight from New York to California.  Plaintiff Visweswara provided her destination and arrival locations, information on her desired form of airfare accommodations (*e.g.,* her seating)*,* the PII required to book a flight (*e.g.*, her name, address, government identification numbers, gender, etc.) and her payment information. Additionally, the tracking code collected other information, including whether Plaintiff Visweswara closed the website, a Google identifier, and other data that is detailed below.

30.    While on Defendant's website, Plaintiff Visweswara was entirely unaware that she was being tracked for the purpose of setting pricing.

31.    Not only was Plaintiff Visweswara not adequately informed about the sale of her PII to these third parties, but she was not adequately compensated for her sensitive and valuable information.

32.    Plaintiff Visweswara has suffered the following injuries from (1) the interception of her Private Data for an unauthorized and exploitative purpose, (2) the disclosure of her private and valuable data to unauthorized third parties for an unauthorized and exploitative purpose, and (3) the failure to justly compensate Plaintiff Visweswara for her Private Data:

   a.    The loss of value of PII and/or travel data that might be associated with Plaintiff Visweswara's visits to Defendant's website;

   b.    Intrusion upon Plaintiff Visweswara's and Class Members' privacy on Defendant's website where it was reasonable for Plaintiff Visweswara and Class Members to have an expectation of privacy;

7

c.  Lack of compensation for the sale of Plaintiff Visweswara's and Class Members'
data; and

d.  Profiting from the collection, retention, use and/or sale of Plaintiff Visweswara's
and Class Members' data in a way that would be inequitable sans disgorgement of
profit.

33.  Had Plaintiff Visweswara known about the surreptitious collection and tracking of
her PII, she would have used a different website to book her travel.

## DEFENDANT

### *Defendant JetBlue Airways Corporation*

34.  Defendant JetBlue is a Delaware corporation with its principal place of business
located at 27-01 Queens Plaza North, Long Island City, New York, 11101.

35.  Defendant is a sophisticated business that provides airline tickets and other airfare
to millions of Americans on an annual basis—indeed, it is one of the largest airlines in the United
States.

36.  In the course of doing business, Defendant maintains a website at the following
URL address: *www.jetblue.com*.  Consumers seeking airline tickets, like Plaintiffs and Class
Members, use this website.

## FACTUAL ALLEGATIONS

### *Defendant's Business and Data Collection*

37.  Defendant is an American airline headquartered in Long Island City, New York,
and ranked as the sixth largest airline in the U.S. in 2021.  Defendant's primary hub is John F.
Kennedy International Airport, and carries customers to more than 100 destinations throughout

the United States, Latin America, Caribbean, Canada, and Europe.[6]  As of March 31, 2026, Defendant reported 291 aircrafts in its operating fleet.[7]

38.    Defendant provides flights to airline passengers by assisting with the booking process both through its website and on third-party websites.  In order to do this, consumers who use Defendant's website provide Defendant with significant data to find the right flight(s).

39.    By its very nature, Defendant—a business that is frequented by Plaintiffs and Class Members—is the type of business that requires heightened levels of privacy.  The collection of data is highly sensitive, which is why Defendant promises discretion both in the way it conducts its business and with respect to the data it collects through its website (and through other means). Including in its "Privacy Policy" page where Defendant states that "[o]ur privacy commitments are fundamental to the way we run our business" and that "[Defendant] may share information that does not identify you (including information that has been aggregated or de-identified)."[8] This can be seen below:



**Figure 1**

40.    Furthermore, Defendant initially seems to understand the critical nature of protecting passenger data but immediately contradicts itself stating that aspects of the website do

---

[6] *Investor Relations*, Jetblue, https://ir.jetblue.com/overview/default.aspx (last visited June 2, 2026).
[7] JetBlue Airways Corp., Quarterly Report (Form 10-Q) (March 31, 2026).
[8] JetBlue (Privacy Policy), *supra* note 4.

not work unless users opt into the data sharing. Even so, if consumers opt into Defendant's data sharing, the Privacy Policy does not disclose that their PII is being used to set prices. Rather, the Privacy Policy represents that data is used to "personalize your customer experience and serve you with advertisements and other information appropriate and relevant to you and your interests"—which a reasonable consumer would understand to mean content personalization and targeted advertising, not price manipulation. In fact, these are the only purposes for data collection, retention, and use that Defendant discloses within its Privacy Policy:

    a. Use by Service Providers (payment processing, travel and booking reservation, identity verification, data analytics, marketing and advertising, website hosting, and technical support);

    b. Vendors and Other Parties (advertising and analytics);

    c. Affiliates (customer support, marketing, booking, advertising and technical operations);

    d. Partners (for services and distribution of products or joint ventures);

    e. Promotions;

    f. Public Forums;

    g. Merger and Acquisition;

    h. Security or Compelled Disclosure (to law enforcement and other authorities);

    i. Facilitating Requests (via social media); and

    j. Consent. [9]

41. Defendant does not disclose the use of consumer data for the purpose of dynamic surveillance pricing. Notably, the Privacy Policy states that JetBlue "do[es] not sell personal

---

[9] *Id.*

information we hold about you to third parties," yet Defendant permits third parties like FullStory, Dynamic Yield, and PROS to access and exploit consumer data for pricing purposes.  And the data that the Privacy Policy purports to collect is vast:

     a.  Contact Data (first and last name, email address, postal address, telephone number);

     b.  Billing Information;

     c.  Demographic Data (age, gender, and country of origin);

     d.  Profile Data (interests, inferences, preferences, and favorites);

     e.  Content (posted on forums or on JetBlue's blogs);

     f.  Personal Contacts and Other Passenger Data;

     g.  Job Applicant Data (if applicable).[10]

42.     Finally, Defendant lists the types of data collected through tracking technology (while not disclosing that the end use is for dynamic surveillance pricing):

     a.  Internet Protocol address;

     b.  Device Identifier;

     c.  Browser Type and Version;

     d.  Operating System and Platform;

     e.  Mobile Device Type;

     f.  Wireless Carrier;

     g.  Data Regarding Network Connected Hardware;

     h.  The Time Spent Engaging With JetBlue's Services;

     i.  Page Views;

---

[10] *Id.*

j.   Information Searched For;

k.   Geo-Location Data;

l.   Pages Visited;

m.  Content and Advertisements Viewed;

n.   Products and Services Viewed;

o.   Purchases and Purchase History;

p.   Time of Day When Browsing;

q.   Referring Pages; and,

r.   Exiting Pages. [11]

43.    Defendant makes privacy assurances and representations which directly contradict the reason and rationale for the types of data JetBlue collects.  Privacy-based representations are material components of the services that Defendant offers through its website.  Defendant knows this, since it is commonly accepted that consumers care about privacy, and any related representations are made to drive up goodwill, website traffic, and consumer trust. [12]

44.    Defendant also makes significant assumptions based on the data it collects, which in turn impacts pricing.  For example, on information and belief, the Operating System and Platform a consumer uses may seem benign, but it is commonly used to infer the socioeconomic status of a consumer—*e.g.*, consumers who use Apple's iOS operating system are often wealthier than those who use Android. [13]  Additionally, Defendant collects information about the geographic

---

[11] *Id.*

[12] *See, e.g.* Colleen McClain et al*., How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/ ("most Americans are concerned about how companies and the government use their information").

[13] *See, e.g.* Robert Williams, *Survey: iPhone owners spend more, have higher incomes than Android users*, MARKETINGDIVE (Oct. 31, 2018), https://www.marketingdive.com/news/survey-iphone-owners-spend-more-have-higher-incomes-than-android-users/541008/ ("IPhone owners tend to have higher incomes and spend more on technology than Android users do, according to a survey by crowdsourced shopping platform Slickdeals."); Alex Bitter & Geoff Weiss, *A lawsuit against DoorDash alleges what some users have long suspected: the company charges*

location (geo-location) of consumers, which allows it to adjust prices based on a consumer's zip code or the socioeconomic profile of where they live or are located.

45.     This is all highly concerning.  It allows Defendant to manipulate prices in real time for consumers based on their private information which they did not consent to surrender for this purpose.

### *Defendant's Surveillance Pricing*

46.     Rather than keep Plaintiffs' and the Class's PII private and protected, Defendant instead opted to make it available for collection by third parties like Dynamic Yield, FullStory, and PROS Holdings, Inc. ("PROS") that use PII to glean insights that enhance JetBlue's ability to extract maximum profit from its consumers.

47.     Defendant knew that third parties were using its website to collect data because JetBlue itself had to code the third-party trackers into JetBlue's website's codebase.  JetBlue then profited from the insights those third parties helped Defendant glean about consumers' willingness to pay certain prices.

48.     ***Dynamic Yield.***  Dynamic Yield is a digital AI platform which has tracking technology on JetBlue's booking website (as discussed below) and lists JetBlue as one of its clients.[14]  According to its business partner SAP Engagement Cloud, "Dynamic Yield is an AI-powered personalization and optimization platform that helps leading brands create personal digital experiences that drive engagement, conversions, and revenue."[15]  Essentially, Dynamic

---

*Apple users more than Android owners*, BUSINESS INSIDER (May 19, 2023), https://www.businessinsider.com/lawsuit-iphone-users-pay-more-doordash-orders-than-android-users-2023-5 ("A proposed class-action suit claims that the delivery service tacks on extra fees to orders placed through iPhones compared to otherwise identical orders from users with Android smartphones."); Mohd Junaid, *Are iphone users charged extra on mobile app?*, LinkedIn (December 31, 2024), https://www.linkedin.com/pulse/iphone-users-charged-extra-mobile-app-mohd-junaid--kknec/ ("[I]Phone users are often perceived as more affluent, leading companies to adjust prices based on device type.").

[14] *Select Customers*, Dynamic Yield, https://www.dynamicyield.com/clients/ (last visited June 2, 2026).

[15] *Dynamic Yield*, SAP Engagement Cloud, https://emarsys.com/partner-ecosystem/directory/technology-partners/dynamic-yield/ (last visited June 2, 2026).

Yield collects data and then uses AI to tailor customers' purchasing experiences on websites, including JetBlue's.

49.    An image of the code on JetBlue's website containing Dynamic Yield's tracking technology appears as follows:

https://st.dynamicyield.com/st?sec=87911
40&ref=https%3A%2F%2Fwww.jetblue.co
m%2F&scriptVersion=2.84.0&inHead=true
&id=0&jsession=fwf9jt9b1b4irvlfiurpg20d
065rxonn&isSesNew=true&dyid_server=0
&ctx=%7B%22type%22%3A%22PRODUC
T%22%2C%22data%22%3A%5B%22NYC-
JAX%22%5D%7D&noConsent=true

**Figure 2**

50.    Among the public-facing successes Dynamic Yield lists on its website, Dynamic Yield hails its work for travel companies and "boost[s] revenue per user for specific target audiences by 2.5% by displaying recently viewed accommodations on the homepage for returning visitors."[16] Put differently, Dynamic Yield's trackers, which JetBlue deploys on its website, track when users return to the website (among other behaviors) in order to modify JetBlue's pricing upon the user's return.

51.    According to Dynamic Yield, its service allows retailers to use deep learning and reinforcement learning to "gain deeper user demographics, preferences, and real-time behavior that allows you to tailor every [] experience like magic."[17] Dynamic Yield also states that retailers

---

[16] *HRS eases booking process for business travel*, Dynamic Yield, https://www.dynamicyield.com/case-studies/hrs/ (last visited June 2, 2026).

[17]*Predict your customer's needs every time, without the lift: Cutting-edge algorithms that put your customers first*, Dynamic Yield, https://www.dynamicyield.com/recommendations/ (last visited June 2, 2026).

can "dynamically adjust recommendations across product and content to reflect a customer's preferences, affinities, and behavior in real-time."[18]

52.    The way that Dynamic Yield works is through tracking technology which collects datapoints that then target certain users for different types of purchasing characteristics. According to an article written by Dynamic Yield, it uses targeting based on data involving: time of day, affinity (users who express high interest), new user/first session targeting (targeting users who are in their first session), session behavior (based on page views and behaviors taken on the website), shared-audience behavior (linking behavior from another retailer which uses Dynamic Yield tracking to the current website's use of the tracking), traffic source (targeting based off of origin of traffic, like from social media, etc.), technology use (the type of device, browser, operating system, operating brand, screen resolution, and user agent), location (targeting based off of geographic location), weather forecasts (predictive weather forecasts which might impact behavior in purchasing), and other types of data.[19]  Much of this can be seen in the code which Dynamic Yield deploys on JetBlue's website.

53.    For example, as the backend code of the website reveals, Dynamic Yield's trackers know when a user has engaged in a previous session and who the user is; it then analyzes user behavior (called an 'empathy segment' or 'empathy type') to assess purchaser type:

---

[18] *Recommendations*, Dynamic Yield, https://www.dynamicyield.com/recommendations/ (last visited June 2, 2026).
[19] Yaniv Navot, *An overview of Dynamic Yield's Essential Recommendation Capabilities*, Dynamic Yield, https://www.dynamicyield.com/blog/essential-recommendation-capabilities/ (last visited June 2, 2026).



**Figure 3**

54.     In the assessment shown in Fig. 3, Dynamic Yield makes assumptions that the customer on JetBlue's website is "confident," "satisfied," and "focused." These are all behavioral determinations that yield insights into consumer behavior and tendencies, including their price elasticity. Dynamic Yield's code also includes brackets of what prices could be adjusted to in the same analysis, which the code calls a "price differential:"

[{"condType":"PageVisited","subType":null,"conds":[{"id":13106301,"parameter":null,"selectMethod":"contains","selectParameter":"utm_campaign=jba_mh_meta_sale_retail-conversion-comfortvalue","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":1}]}]},{"audience":2990741,"updatedAt":"2026-02-03 22:52:54","session":0,"sticky":0,"hidden":0,"conditionDays":30,"validDays":1,"audienceType":"user_attributes","name":"Price Differential: $0-50","rule":
[{"condType":"SiteEvent","subType":null,"conds":[{"id":13107161,"parameter":73606598,"selectMethod":"equals","selectParameter":"$0-50 - Price Differential","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":0}]}]},{"audience":2990742,"updatedAt":"2026-02-03 22:53:15","session":0,"sticky":0,"hidden":0,"conditionDays":30,"validDays":1,"audienceType":"user_attributes","name":"Price Differential: $50-100","rule":
[{"condType":"SiteEvent","subType":null,"conds":[{"id":13107167,"parameter":73606600,"selectMethod":"equals","selectParameter":"$50-100 - Price Differential","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":0}]}]},{"audience":2990744,"updatedAt":"2026-02-03 22:54:09","session":0,"sticky":0,"hidden":0,"conditionDays":30,"validDays":1,"audienceType":"user_attributes","name":"Price Differential: $100+","rule":
[{"condType":"SiteEvent","subType":null,"conds":[{"id":13107169,"parameter":73606599,"selectMethod":"equals","selectParameter":"+$100 - Price Differential","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":0}]}]},{"audience":2996346,"updatedAt":"2026-02-13 04:12:35","session":0,"sticky":0,"hidden":0,"conditionDays":7,"validDays":1,"audienceType":"user_attributes","name":"SJU (JBV)","rule":

**Figure 4**

55.     Part of this analysis, which can be seen in the code, also includes the user's personally assigned identifier ("id":13107167), whether the user has engaged in a previous session ("session":0), the user's attributes ("user_attributes") and other factors.

56.    Dynamic Yield allows for customized implementation of rules that use the collected data to make determinations.  As Dynamic Yield states, retailers can "[a]dd real-time filter rules to filter the results based on data obtained within the session (*e.g.* show products priced higher than the currently viewed product, present products based on the visitor's explicit selection, etc.).[20]  Dynamic Yield can also ensure that a retailer includes a certain subset of products (whitelisted) or excludes them (blacklisted) based on the data collected.[21]  All of this means that, contrary to Defendant's public representations, Defendant deploys technology on its website that intercepts user PII, fails to disclose the purpose for its collection, and then either adjusts prices based on consumer behavior predicated on collected data and/or white- or blacklists certain products based on that consumer's behavior.

57.    The use of personalized code that tracks individual consumers is not a practice that Dynamic Yield keeps confidential; in fact, the company openly advertises this capability as part of its commercially available e-Commerce service.  For example, Dynamic Yield states that, for one e-Commerce customer, "[s]erving personalized recommendations powered by deep learning algorithms le[d] to 88% increase in average revenue per user."[22]  The case study of that particular customer discussed how "Dynamic Yield's deep learning recommendations could not only mine the past behavior of users, but their in-session activity."[23]

58.    ***FullStory.***  As introduced above, FullStory is a behavioral analytics and data collection platform that provides "behavior data platform to optimize its digital experience [b]y closely monitoring revenue-impacting features and enhancing user flows[,]" services using data

---

[20] *Id*.

[21] *Id.*

[22] *Transform browsers into buyers with a shopping experience just for them (Glasses USA Module)*, Dynamic Yield, https://www.dynamicyield.com/ecommerce/ (last visited June 2, 2026).

[23] *GlassesUSA.com deploys a deep learning algorithm to adapt its recommendations to each shopper*, Dynamic Yield, https://www.dynamicyield.com/case-studies/glassesusa/ (last visited June 2, 2026).

collection, behavioral analysis, and user targeting, and uses trackers to collect data on numerous

pages across Defendant's website.[24]

59.    FullStory's tracking code appears on JetBlue's website:



**Figure 5**

60.    According to JetBlue's Digital Experience Product Manager, Greg Kaplan, "[w]ith

FullStory, we can make product decisions faster.  If an issue crops up, I can see how big its impact

is within two minutes and determine how we should prioritize it.  With other tools, there can be a

significant lead time between when the data is logged and when it's indexed and available—it's

been so valuable to have the data at our fingertips immediately."[25]

61.    ***PROS.***   Airlines have used dynamic pricing for decades, including with the

assistance of products like those created by PROS.  JetBlue shares consumer data with PROS,

which uses an algorithm to set pricing in real time based on "buyer behavior."

62.    In fact, when JetBlue began to use PROS revenue management dynamic pricing

system, PROS touted its use as a success story.  The company brags that "JetBlue is rewriting the

rules of revenue management with PROS Revenue Management Advantage (RMA).  By shifting

---

[24]*JetBlue reduces payment errors by 20%*, FullStory, https://www.fullstory.com/customer-story/travel-hospitality/jetblue/ (last visited June 2, 2026).
[25] *Id.*

18

from manual overrides to science-backed forecasting, the airline is unlocking analyst efficiency and strategic confidence."[26]

63.    The job of PROS is to set prices through algorithms, and algorithms do this through the collection of data. According to the *Financial Times*, as far back as a decade ago "PROS [] algorithms set more prices each day than Twitter sends tweets."[27]

64.    Today, PROS uses real-time dynamic pricing which sets pricing at the time of the transaction to maximize revenue. The only way that PROS would be able to accomplish this task is by having access to relevant data points mined from consumers. As PROS explains, its real-time dynamic pricing "captures price elasticity more accurately, reducing lost revenue from overpricing or underpricing scenarios."[28] PROS has a model of this on its website:



**Continuous Pricing**

PROS Real-Time Dynamic Pricing supports AI-driven continuous pricing, helping airlines offer fares between predefined price levels instead of relying on rigid class-based pricing. This scientific approach uses real-time data and advanced algorithms to adjust fares dynamically, capturing hidden demand and increasing revenue with more precise, market-responsive pricing.

**Figure 6** [29]

---

[26]    PROS, *Customer Testimonial*, Facebook (June 26, 2025), https://www.facebook.com/photo.php?fbid=1220814670057122&id=100063858017772&set=a.522184349920161.
[27] David J Lynch, *Policing the digital cartels*, FINANCIAL TIMES (Jan. 8, 2017), https://www.ft.com/content/9de9fb80-cd23-11e6-864f-20dcb35cede2?syn-25a6b1a6=1 ("'***If the goal is to do bad things, automated systems and algorithms could help you do bad things faster***,' says John Salch, technology leader with PROS Holdings Inc, a Houston-based pricing software company.") (emphasis added).
[28] Justin Jander, *What Exactly is Dynamic Pricing in the Airline Industry?*, PROS (June 1, 2026), https://pros.com/learn/blog/what-exactly-is-dynamic-pricing-airline-industry/.
[29] *Right Price, Right Now*, PROS, https://pros.com/products/real-time-dynamic-pricing-software/ (last visited June 2, 2026) ("PROS Real-Time Dynamic Pricing helps RM teams deliver more accurate, competitive prices today—while

65. Because "[k]ey inputs include demand forecasts, price elasticity, competitor fares, *customer attributes*, and booking context," consumer PII is invaluable for JetBlue and companies like PROS that assist it with dynamic pricing capabilities.[30]

66. Additionally, PROS's 2024 annual report stated that its software adapts based on the particular customer: "[o]ur AI-powered algorithms provide market-relevant price guidance, dynamically refining prices in response to changing market conditions and buyer behavior. This predictive and prescriptive price guidance tailors pricing for each unique buying scenario."[31]

67. In fact, in July of 2024, Mastercard (which owns Dynamic Yield) and PROS were both sent letters by the Federal Trade Commission about their use of surveillance pricing.[32] The Federal Trade Commission ("FTC") then issued a Request for Public Comments Regarding Surveillance Pricing Practices.[33] More than 25% of the comments in public submission on the docket directly complained of surveillance pricing by airlines. One publicly submitted anonymous comment stated, "[a]irline ticket price searching" is the "most apparent" form of surveillance pricing leading to the "worst experience for finding affordable tickets."[34]

---

supporting your transition toward class-free continuous pricing, and the broader shift towards modern airline retailing.").

[30] Jander, *supr*a note 28.

[31] PROS Holdings, Inc., Annual Report (FORM 10-K) at 2 (Feb. 12, 2025).

[32] *See FTC Orders PROS, 7 Others To Provide "Surveillance Pricing" Information*, TED MAGAZINE (July 24, 2024), https://tedmag.com/ftc-orders-pros-7-others-to-provide-surveillance-pricing-information/; Press Release, *FTC Issues Orders to Eight Companies Seeking Information on Surveillance Pricing, Federal Trade Comm'n* (July 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-issues-orders-eight-companies-seeking-information-surveillance-pricing.

[33] *See Request for Public Comments Regarding Surveillance Pricing Practices*, Regulations.gov (Jan. 20, 2025), https://www.regulations.gov/docket/FTC-2025-0007.

[34] *Comment from Anonymous*, Regulations.gov (Jan. 21, 2025), https://www.regulations.gov/comment/FTC-2025-0007-0030.

68.    *Google.*  In addition to the trackers described above, JetBlue also allows for the presence of Google Tag Pixels on its website, which individually identify consumers,[35] contrary to the Privacy Policy's promise not to do so.

69.    *Cookies*.  JetBlue also embeds cookies into its website that can be used to set pricing.  For example, JetBlue uses cookies, like the ones in the code depicted in Fig. 7 below, to collect consumer data when the consumer books a flight.  On information and belief, this happened to Plaintiffs Yun and Visweswara as explained above.

```
https://www.jetblue.com/booking/flights?
adults=1&children=0&infants=0&from=NY
C&to=JAX&return=2026-04-28&depart=2
026-04-23&isMultiCity=false&noOfRoute
=1&roundTripFaresFlag=false&sharedMar
ket=false&usePoints=false

https://sdk.asapp.com/chat-sdk-iframe.ht
ml?APIHostname=jetblue.asapp.com&Co
mpanyMarker=jetblue&Origin=https%3A%
2F%2Fwww.jetblue.com%2Fbooking%2Ffli
ghts&RegionCode=US&Language=en

https://www.jetblue.com/booking/flights?
adults=1&children=0&infants=0&from=NY
C&to=JAX&return=2026-04-28&depart=2
026-04-23&isMultiCity=false&noOfRoute
=1&roundTripFaresFlag=false&sharedMar
ket=false&usePoints=false
```

**Figure 7**

70.    As seen in Fig. 7, the tracker collects passenger type (by age), departure and destination data, proposed dates of travel, whether or not the fares should be flagged as round trip, the booking origin (Defendant's website), the region of booking (United States) and the language used to book the flight (English).

---

[35]   *See  generally  Build  first-party  segments  based  on  pixel  tags*,  Google, https://support.google.com/admanager/answer/2508388?hl=en (last visited June 2, 2026) ("You can build first-party audience segments without serving any ads by adding a 1x1 transparent Audience pixel tag to your site or mobile app.").

71.     Plaintiffs' PII is highly valuable; and because a variety of different end-users could have various applications for it, the data maintains its value as it is collected, sold, and resold. Defendant allows for the collection of this valuable data at its primary source: directly from Plaintiffs and Class Members themselves.

***The Harms of Surveillance Pricing***

72.     Surveillance pricing is the use of personal data, like "browsing history, spending habits, location, or even signals about [ ] income to figure out what you're likely willing to pay, and then adjust accordingly."[36]   While surveillance pricing is not illegal in the United States, secretly collecting consumer data on the internet without adequate consent *is* illegal.

73.     According to Lindsay Owens, a privacy expert who leads the Groundwork Collaborative think-tank, JetBlue's April 18th tweet, "sounded like an accidental admission.  The logic is pretty straightforward: if clearing your cookies can change the price you see, then something beyond basic supply and demand may be influencing that number."[37]

74.     JetBlue denied this practice, stating that the admission was "incorrect and we [JetBlue] apologize for the error."  It also added "JetBlue fares on JetBlue.com and our mobile app[lication] are not determined by cached data or other personal information.  We do not use AI or personal data to set individual pricing.  All customers have access to the same fares."[38]

75.     The FTC defines surveillance pricing as follows:

---

[36] Celia Robbins, *Are Airlines Watching You Browse? A Deleted JetBlue Tweet Raises Questions,* TravelPirates (April 22, 2026), https://www.travelpirates.com/captains-log/jetblue-surveillance-pricing-explained.
[37] *Id.*
[38] Teresia Gray, *Did JetBlue Just Admit the Quiet Part Out Loud?*, THE MARY SUE (Apr 21, 2026, 8:32 pm), https://www.themarysue.com/jetblue-surveilance-pricing-tweet-data-controversy-explained/.



**Figure 8**

76.     According to former FTC Commissioner Lina M. Khan, "Firms that harvest Americans' personal data can put people's privacy at risk.  Now firms could be exploiting this vast trove of personal information to charge people higher prices.  Americans deserve to know whether businesses are using detailed consumer data to deploy surveillance pricing."[39]

77.     Additionally, members of Congress have mobilized to seek answers from JetBlue for its predatory use of surveillance pricing, as manifested by a letter Senator Ruben Gallego and Representative Greg Casar on April 21, 2026 to Joanna Geraghty, Chief Executive Officer of JetBlue, calling for responses concerning its use of personal data for the setting of fare prices.[40]

---

[39] *FTC Issues Orders to Eight Companies Seeking Information on Surveillance Pricing*, Federal Trade Comm'n (July 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-issues-orders-eight-companies-seeking-information-surveillance-pricing.
[40] *See Letter from Ruben Gallego, United States Senator & Greg Casar, Member of Congress, to Joanna Geraghty, Chief Executive Officer of JetBlue* (April 21, 2026), https://casar.house.gov/sites/evo-

In part, the letter states: "[w]hile JetBlue claimed in the wake of this post that fares are not 'determined' by cached data or other personal information, this exchange raises questions about how JetBlue sets prices—specifically, how JetBlue is defining personal data and whether personal data is used in any capacity to inform prices. We are especially concerned that customers could be charged different prices for the same flight based on their need for travel, such as attending a funeral."[41]

78.     Defendant's conduct, as described herein and as summarized in this letter from Congress, violates numerous laws as well as principles of privacy and basic decency.

### *Defendant's Conduct Offends Basic Privacy Rights*

79.     A JetBlue customer has a reasonable expectation of privacy, arising from both the sensitive nature of the data collected in the course of purchasing a plane ticket and the representations made on Defendant's website. Airline passengers who conduct transactions through Defendant's digital storefront are entitled to the same privacy protections afforded to consumers at a physical ticketing counter. This expectation is especially warranted here, where Plaintiffs and Class Members neither anticipated nor adequately consented to third-party corporations observing their digital transactions with Defendant.

80.     The data points Defendant collects, including device identifiers, IP addresses, and login credentials, combined with records of Plaintiffs' use of Defendant's website to procure services, constitute highly sensitive information.

81.     Rather than safeguard this information, Defendant—lacking consent from Plaintiffs and Class Members—permits third parties to collect, retain, and use it.

---

subsites/casar.house.gov/files/evo-media-document/jetblue-surveillance-pricing.pdf (citing JetBlue [@JetBlue], April 18, 2026, https://x.com/JetBlue/status/2045593704434438431).
[41] *Id.*

*The Value of Consumer Data Beyond Ticket Prices*

82.    Plaintiffs and Class Members suffered harm when Defendant invaded their privacy rights by weaponizing their data for surveillance pricing through Defendant's website. Reasonable airline passengers, who are consumers, would not have used Defendant's website had they known that their privacy rights would be invaded as a result.

83.    PII is extremely valuable in both intangible and commercially measurable ways. A market exists for the PII collected on Defendant's website.  Plaintiffs and Class Members suffered pecuniary losses when Defendant sold and allowed for the resale of their data to unauthorized third parties given the resulting diminishment of value of their PII.

*Harm to Consumers*

84.    Plaintiffs and Class Members provided their data to Defendant to obtain information regarding the travel services that Defendant provides, services that happen to be highly personal and very private.  Third parties, including FullStory, Dynamic Yield, and PROS as listed herein, disclosed and intercepted this information through digital tracking technology. These third parties collected and intercepted this information for business purposes, including to monitor consumer behavior and to assist Defendant in adjusting airline pricing accordingly.

85.    Plaintiffs and Class Members did not adequately consent to the interception or disclosure of their data to these third parties, or to anyone else.  As such, Plaintiffs and Class Members have suffered from the type of privacy-centric harms that a patchwork of privacy protections under federal, state, and common law principles were intended to collectively protect against.

25

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this Action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes (collectively, the "Class"):

**Nationwide Class:** All natural persons in the United States who used the Defendant's website and/or mobile application to complete a purchase and whose communications and/or data was shared with third parties during the applicable statutory period.

**New York Sub-Class:** All natural persons in the state of New York who used the Defendant's website and/or mobile application to complete a purchase and whose communications and/or data was shared with third parties during the applicable statutory period.

87.     Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

88.     *Numerosity*.   The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable.  The Class likely consists of thousands or even millions of individuals, and Defendant's records can identify the members.

89.     *Predominant Common Questions*.  The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class Members.  Common questions for the Class include, but are not limited to, the following:

a.   Whether Defendant violated Plaintiffs' and Class Members' privacy rights;

b.   Whether Defendant violated the ECPA;

26

c. Whether Defendant's acts and practices violated state consumer protection laws;

d. Whether Defendant's conduct is a breach of implied contract;

e. Whether Defendant was unjustly enriched;

f. Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and,

g. Whether Plaintiffs and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

90. *Typicality*. Plaintiffs' claims are typical of the claims of the other members of the Class and arise from the same conduct by Defendant and are based on the same legal theories.

91. *Adequate Representation*. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any victim. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

92. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

93.    Plaintiffs may revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. §§ 2510, *et seq.* ("ECPA")
(ON BEHALF OF THE NATIONWIDE CLASS)

94.    Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

95.    ECPA makes it illegal to intentionally intercept, or attempt to intercept, any wire, oral, or electronic communication and to disclose or use the contents of an unlawfully intercepted communication.  18 U.S.C. § 2511.

96.    ECPA provides a private right of action to any person whose electronic communications have been intercepted.  18 U.S.C. § 2520(a).

97.    Defendant intentionally intercepted electronic communications that Plaintiffs and Class Members exchanged with Defendant through the tracking tools installed on its website.

98.    The transmissions of data between Plaintiffs and the Class Members and Defendant qualify as communications under ECPA.  18 U.S.C. § 2510(12).

99.    Defendant contemporaneously intercepted and transmitted Plaintiffs' and the Class Members' communications of that data to the companies whose trackers Defendant installed or allowed to be installed on its website as well as for the purpose of engaging in third-party tracking for behavioral analysis to modify ticket pricing.

100.    The trackers that Defendant uses to track Plaintiffs' and the Class Members' communications, Plaintiffs' and the Class Members' browsers, Plaintiffs' and the Class Members'

28

computing devices, and the code that Defendant placed or allowed to be placed on its website are all "devices" within the meaning of 18 U.S.C. § 2510(5).

101. The third-party companies, including Dynamic Yield and FullStory, that receive communications between Plaintiffs and the Class Members, on the one hand, and Defendant, on the other, are not party to those communications.

102. Defendant transmits the contents of those communications through the surreptitious redirection of the communications from Plaintiffs' and the Class Members' computing devices.

103. Plaintiffs and the Class Members did not consent to the third-party companies' acquisition of their communications with Defendant. Nor did the third-party companies receive adequate legal authorization to receive such communications.

104. In disclosing the content of Plaintiffs' and the Class Members' communications relating to the purchase and use of Defendant's products and/or services, Defendant had a purpose that was tortious, criminal, and designed to violate statutory provisions including:

    a. The unauthorized disclosure of PII is tortious in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use. Defendant intentionally committed a tortious act by disclosing individually personally identifiable information without authorization to do so;

    b. Intrusion upon Plaintiffs' and the Class Members' seclusion;

    c. Trespass upon Plaintiffs' and the Class Members' personal and private property; and

    d. Violation of 18 U.S.C. §§ 1343 (fraud by wire, radio, or television) and 1349 (attempt and conspiracy) which prohibit a person from "devis[ing] or intending to

29

devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice."

105.     The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the defendant did so with intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were used.  The attempt version of the statute provides that penalties apply to attempts as well as offenses.  18 U.S.C. § 1343.

106.     Defendant's scheme or artifice to defraud consists of the false and misleading statements in its privacy policy described herein.

107.     Defendant acted with intent to defraud in that it willfully invaded and took Plaintiffs' and the Class Members' property, including the property rights to their PII and their right to determine whether such information remains confidential; the right to determine who may collect and use such information for marketing; and the right to determine who has access to their devices and communications.

108.     Defendant also acted with intent to defraud in that it willfully invaded and took Plaintiffs' and the Class Members' property (their PII) with knowledge that it lacked consent or authorization to do so; a reasonable consumer would not understand that Defendant was collecting and transmitting their data to third parties; a reasonable consumer would be shocked to realize the extent of Defendant's disclosure of data to third parties for the purpose of behavioral analytics

and surveillance pricing.

109.   Defendant acted with the intent to acquire, use, and disclose Plaintiffs' and the Class Members' PII without their authorization or consent.

110.   Plaintiffs and the Class Members have suffered damages because of Defendant's violations of ECPA, including that (1) Defendant eroded the essential, confidential nature of the relationship between Defendant and Class Members, (2) Defendant derived valuable benefits from using and sharing Plaintiffs' and the Class Members' communications without their knowledge or informed consent and without providing compensation, (3) Defendant's actions deprived Plaintiffs and the Class Members of the value of their PII, (4) Defendant's actions diminished the value of Plaintiffs' and the Class Members' property rights in their PII, and (5) Defendant violated Plaintiffs' and the Class Members' privacy rights by sharing their PII for commercial use.

111.   Plaintiffs and the Class Members seek appropriate declaratory or equitable relief including injunctive relief, actual damages and profits enjoyed by Defendant due to the violations or the appropriate statutory measure of damages, punitive damages, and reasonable attorneys' fees and costs.  Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Class Members seek monetary damages for the greater of (i) the sum of the actual damages suffered and any profits made by Defendant due to the violation or (ii) statutory damages of whichever is greater of $100 a day for each day of violation or $10,000.

112.   Unless enjoined, Defendant will continue to commit the violations of law described herein.

## SECOND CAUSE OF ACTION

**VIOLATIONS OF NEW YORK'S
DECEPTIVE TRADE PRACTICES ACT ("GBL § 349")
N.Y. GEN. BUS. LAW § 349**
(ON BEHALF OF THE NATIONWIDE CLASS
AND NEW YORK SUBCLASS)

113.    Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

114.    Defendant is considered a 'business' under GBL § 349.

115.    Defendant's business acts and practices are unfair and deceptive under GBL § 349. New York (as well as other states through their respective unfair and deceptive trade practices statutes) has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data.  Defendant violated GBL § 349 by, among other things, disclosing and intercepting Plaintiff's and Class Members' sensitive data, including PII, without consent and also by using this PII against consumers for their financial exploitation and JetBlue's commercial gain.

116.    Defendant further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties in the manner that it did, which deceived and misled users of Defendant's platform.

117.    Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.  The gravity of the harm of Defendant secretly disclosing, intercepting, and misusing Plaintiffs and Class Members' sensitive and highly valuable personal data is significant, and there is no corresponding benefit resulting from such conduct.

118.    Finally, because Plaintiffs and Class Members were completely unaware of

Defendant's conduct, they could not have possibly avoided the harm.

119. Indeed, under GBL § 349(2)(i)-(ii), "[a]n act or practice is abusive when: it materially interferes with the ability of a person to understand a term or condition of a product or service; or it takes unreasonable advantage of: a lack of understanding on the part of a person of the material risks, costs, or conditions of a product or service, the inability of a person to protect such person's interests in selecting or using a product or service, the reasonable reliance by a person on a person engaging in the act or practice to act in the relying person's interests" as is the case here with JetBlue's dynamic pricing-related practices. Indeed, although Defendant's Privacy Policy states that Defendant uses and shares personal information in certain circumstances, Plaintiffs and the Class Members could not have given informed consent for the type of collection in which Defendant has engaged, given that it was not described in the Privacy Policy or in any other disclosure. In fact, the Privacy Policy expressly promises that unlisted "business or commercial purposes" would only be fulfilled "at your direction or with your notice and/or consent"—a promise JetBlue breached by implementing surveillance pricing without such notice or consent.

120. By unlawfully disclosing and intercepting this data, Defendant has taken money or property from Plaintiffs and Class Members.

121. Plaintiffs and the Class Members seek all available damages under applicable state consumer protection laws, including statutory damages to recover actual damages or $50 per violation, whichever is greater, under GBL § 349(h).

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF NEW YORK'S**
**UNLAWFUL SELLING PRACTICES ACT ("GBL § 396")**
**N.Y. GEN. BUS. LAW § 396**
(ON BEHALF OF THE NATIONWIDE CLASS
AND NEW YORK SUBCLASS)

33

122.    Plaintiffs re-allege and incorporate all preceding paragraphs with the same force and effect as if fully restated herein.

123.    Under GBL § 396, unlawful selling practices are prohibited and can be enforced by private plaintiffs in civil litigation.

124.    Specifically, GBL §396 prohibits the offering "for sale any merchandise, commodity, or service, as part of a plan or scheme with the intent, design, or purpose not to sell the merchandise, commodity, or service so advertised at the price stated therein." GBL § 396(1).

125.    In this instance, Defendant sells the same airline tickets for set prices, only to change those prices with the intent not to sell them if the consumer's personal data determines otherwise.    For example, if the consumer, like Plaintiffs Yun and Visweswara, exits the Defendant's website, the Defendant then has the capacity to change prices and not sell them as advertised with the intent, design, or purpose to do so based on the personal information collected about Plaintiff Yun and Visweswara.

126.    For Defendant's violations of GBL § 396, Plaintiffs and Class Members seek actual damages, attorneys' fees, and any other relief this Court deems just and proper.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the Class respectfully request that the Court enter an order:

    i.    Certifying this case as a class action and appointing Plaintiffs as the Class Representatives;

    ii.    Finding that Defendant's conduct was unlawful, as alleged herein;

    iii.    Awarding declaratory relief against Defendant;

    iv.    Awarding such injunctive and other equitable relief as the Court deems just and

proper;

v.    Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages;

vi.    Awarding Plaintiffs and the Class Members pre-judgment and post-judgment interest;

vii.    Awarding Plaintiffs and the Class Members reasonable attorneys' fees, costs, and other litigation expenses; and

viii.    Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

127.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.


DATED:    June 5, 2026


Respectfully Submitted,

/s/ *Michael P. Canty*
Michael P. Canty
Carol C. Villegas
Danielle Izzo
Gloria J. Medina
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  212-907-0700
mcanty@labaton.com
cvillegas@labaton.com
dimazzeo@labaton.com
gmedina@labaton.com

*Attorneys for Plaintiffs*
*and the Proposed Classes*

35